UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| KENNETH GREGORY WILLIAMS, | Case No. 2:13-cv-00950-AA |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| UNITED STATES DISTRICT COURT JUDGE MICHAEL SIMON, et al., | |
| Defendants. | |

AIKEN, District Judge:

Plaintiff, an inmate at Oregon State Penitentiary, filed suit pursuant to 42 U.S.C. § 1983 alleging numerous violations of his constitutional rights. Defendants now move for summary judgment under Federal Rule of Civil Procedure 56 on plaintiff's remaining claims.[1] For the reasons set forth below, defendants' motion is granted.

---

[1] Plaintiff moves to strike evidence submitted in support of defendants' motion. (ECF No. 170) I find no basis to strike the identified evidence from the record and deny the motion.

1 -    OPINION AND ORDER

DISCUSSION

On September 5, 2015, I granted summary judgment on several of plaintiff's claims.[2] (ECF No. 135) Defendants now move for summary judgment on plaintiff's remaining claims, as follows: 1) Claim I - conspiracy; 2) Claim IV - disciplinary proceedings conducted in violation of plaintiff's due process and equal protection rights; 3) Claim V - confiscation and censorship of plaintiff's mail in violation of his First Amendment rights; 4) Claim VI - denial of legal envelopes in violation of plaintiff's First Amendment right of access to the courts; and 5) Claim IX - arbitrary transfer to segregated housing in violation of plaintiff's due process rights.

To prevail on their motion for summary judgment, defendants must show that there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must construe the evidence and draw all reasonable inferences in the light most favorable to plaintiff. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

A.  Conspiracy

Plaintiff alleges that Drs. Vargo, Shelton, Hanson; Assistant Attorneys General Aaron Sprague and Andrew Hallman; and U.S. District Judge Simon conspired against him by submitting false declarations and making misrepresentations in a prior lawsuit. Am. Compl. at 7-11 (ECF No. 55); *see Williams v. Or. Dep't Corr.*, Case No. 3:10-cv-00730-SI. In previous opinions, the Court dismissed all claims against, Sprague, and Hallman, and Judge Simon has not been served. (ECF Nos. 13, 80) Regardless, Judge Simon's actions in a judicial proceeding are

---

[2] The Opinion and Order of September 5, 2015 did not explicitly grant summary judgment on Claim VIII regarding defendants' alleged opening of legal mail. Am. Compl at 29-30. To be clear, this claim is dismissed for failure to exhaust, just as Claim VII was dismissed. Opinion and Order at 3-4 (ECF No. 135); *see also* Sobotta Decl. at 14-16 (ECF No. 113). Moreover, the claim is subject to dismissal for the reasons set forth in defendants' summary judgment motion. Defs.' Motion at 9-10 (ECF No. 159).

2 -   OPINION AND ORDER

entitled to absolute immunity. *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976) (stating that the "absolute immunity of judges for 'acts committed within their judicial jurisdiction'" is "preserved under § 1983"). With respect to the remaining defendants, plaintiff alleges that Drs. Vargo, Shelton, and Hanson colluded and intentionally submitted false declarations, which led to the dismissal of plaintiff's claims.

Defendants argue that plaintiff's conspiracy claim should be dismissed because conspiracy is a state criminal offense and plaintiff has no standing to raise this claim in federal court. Construing plaintiff's claim liberally, I find that plaintiff arguably invokes the federal constitution and alleges conspiracy to violate his civil rights. *See* 42 U.S.C. § 1985(3). Nonetheless, defendants are entitled to summary judgment.

In his response, plaintiff simply repeats his allegations regarding Sprague and Hallman and argues that former Governor Kitzhaber was obligated to review his complaints. Pl.'s Reply at 15, 20 (ECF No. 168). I dismissed plaintiff's claims against Sprague, Hallman, and Kitzhaber (ECF No. 80), and plaintiff presents no evidence to support an inference that Drs. Vargo, Shelton, and Hanson conspired to deny him the equal protection of the law. *See Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1141 (9th Cir. 2000) (elements of a § 1985(3) claim are: "(1) the existence of a conspiracy to deprive the plaintiff of the equal protection of the laws; (2) an act in furtherance of the conspiracy; and (3) a resulting injury"). Moreover, Judge Simon addressed plaintiff's allegations in his prior action and found no misrepresentation. Case No. 3:10-cv-00730-SI (ECF No. 166). Accordingly, summary judgment is granted on this claim.

B.  Disciplinary Hearing and Sanctions

Plaintiff also alleges that a disciplinary proceeding violated his rights to due process and discriminated against him on the basis of his race. Am. Compl. at 15-20.

3 -   OPINION AND ORDER

On March 14, 2012, plaintiff received a Misconduct Report accusing him of Inmate Assault in the First Degree and Disrespect in the First Degree based on the assault of plaintiff's cellmate. Thornton Decl. at 2 & Att. 2 at 29. On March 20, 2012, Hearings Officer Nancy Thornton conducted a disciplinary hearing and found that plaintiff had committed the charged offenses. Thornton imposed sanctions of 120 days in the Disciplinary Segregation Unit (DSU) with an additional 60 days in the DSU due to the aggravating factor of "persistent involvement in similar misconduct or repetitive assaults." Thornton Decl. Att. 1 at 3. Thornton also imposed a monetary fine, loss of privileges, and restitution for medical expenses.[3] *Id.* Plaintiff maintains that Thornton did not comply with due process requirements and discriminated against him.

"Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). Instead, due process requirements are met if the inmate receives: 1) advance written notice of the charges and the evidence against him; 2) an opportunity to present documentary evidence and witnesses; 3) legal assistance if the charges are complex or the inmate is illiterate; 4) a written statement describing the reasons for the disciplinary action; and 5) a disciplinary decision supported by "some evidence" in the record. *Id.* at 563, 566, 570; *Superintendent v. Hill*, 472 U.S. 445, 454-55 (1985). Generally, judicial review of a prison disciplinary decision is limited to whether there is a denial of procedural due process or evidence of an arbitrary and capricious action. *Hill*, 472 U.S. at 454-55; *Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987). A court must defer to prison officials' judgments and cannot substitute its view of the facts presented in a prison disciplinary hearing. *See Hill*, 472 U.S. at 455 (the "some

---

[3] Plaintiff's cellmate was transported to an outside hospital for treatment and underwent a CT scan or an MRI. Thornton Decl. Att. 2 at 9; Pl.'s Ex. 15 (ECF No. 168-1).

4 - OPINION AND ORDER

evidence" standard does not "require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence").

Plaintiff first argues that he was not given adequate notice of the charges and evidence against him. Plaintiff maintains that the Misconduct Report merely stated that plaintiff's cellmate reported that he fell from his bunk and that correctional officers later found blood on plaintiff's shoes and clothes; plaintiff contends that the evidence presented at the hearing was "totally different." Pl.'s Reply at 8.

I find that plaintiff received sufficient notice of the charges against him. Plaintiff received the Misconduct Report more than twenty-four hours prior to his hearing. The report stated that plaintiff's cellmate "looked as he had been hit numerous times in the face" and referenced the blood found in the cell and on plaintiff's clothing and shoes. Thornton Decl. Att. 2 at 29. Granted, plaintiff apparently learned that he was accused of committing the assault because of his cellmate's Muslim practices on the day of the disciplinary hearing. *Id.* Att. 1 at 20, Att. 2 at 16; Pl.'s Ex. 15 (ECF No. 168-1). However, I find that the Misconduct Report sufficiently notified plaintiff of the charges and the physical evidence against him. Moreover, by plaintiff's own admission, he challenged his cellmate's version of events, suggested that his cellmate took drugs, provided an alternative explanation for his cellmate's injuries, and described his own long-standing Muslim faith.

Plaintiff next argues that Thornton's decision was not supported by reliable evidence. As noted above, "the requirements of due process are satisfied if *some evidence* supports the decision" of prison officials. *Hill,* 472 U.S. at 455 (emphasis added). Here, Thornton noted the blood found on plaintiff's clothing and shoes, blood found in the cell, and the injuries to plaintiff's cellmate. Thornton Decl. Att. 1 at 2-3. While plaintiff takes issue with Thornton's

5 -   OPINION AND ORDER

interpretation of the evidence, the only question before this court is whether "some evidence" supported her decision. This "standard is 'minimally stringent' only requiring '*any* evidence in the record that *could* support'" the disciplinary decision. *Cato*, 824 F.2d at 705 (quoting *Hill*, 472 U.S. at 455-56). I find that the evidence presented could support Thornton's decision, in light of the blood found on plaintiff's clothing and the injuries to his cellmate.

Plaintiff also argues that Thornton's restitution order was not supported by an itemized list of medical services. However, the evidence of record references a medical bill for medical services rendered to plaintiff's cellmate, and plaintiff has acknowledged that the bill was incurred for imaging services. Pl's Ex. 15; Pl.'s Reply at 16. Therefore, some evidence supported the imposition of restitution.

Finally, plaintiff argues that Thornton imposed restitution because of his race. "Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race." *Wolff*, 418 U.S. at 556. To establish a violation of the Equal Protection Clause, the prisoner must present evidence of discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 239-40 (1976).

Plaintiff offers no evidence to support this claim, aside from his allegation that a white prisoner who admitted assaulting another inmate was not ordered to pay restitution for the injured inmate's medical expenses. Pl.'s Reply at 17. Plaintiff offers no declaration from the prisoner or other evidence to corroborate this hearsay statement. Accordingly, plaintiff fails to establish a claim for racial discrimination.

C.  Confiscation and Censorship of Mail and Denial of Envelopes

Next, plaintiff alleges that defendants Hascall and Clark confiscated and refused to mail a letter written to then-Governor John Kitzhaber and refused to provide plaintiff with legal

6 -   OPINION AND ORDER

envelopes for letters to the governor and appointed counsel. Am. Compl. at 21-27; Pl.'s Reply at 4-5. Plaintiff's alleges that these actions violated his rights under the First Amendment.

The evidence reflects that plaintiff could mail his letter to the governor, just not at the State's expense. Pl.'s Exs. 1, 5. A prison need not treat all mail sent to government officials as legal mail, and prison officials here found the letter was not appropriately designated as legal mail. *O'Keefe v. Van Boening*, 82 F.3d 322, 326 (9th Cir. 1996). Further, plaintiff presents no evidence that he had appointed counsel at the time and was denied envelopes for legal correspondence with an appointed attorney. Accordingly, summary judgment is granted on these claims.

D. <u>Transfer to Intensive Management Unit</u>

Finally, in Claim IX, plaintiff alleges that his transfer and continued confinement in the Intensive Management Unit (IMU) violated his due process rights. Am. Compl. at 31-33.

Plaintiff was transferred to the IMU after he completed his term in the DSU for assaulting his cellmate. Thornton Decl. at 2. The IMU is the "maximum level of inmate security, control, and supervision" for inmates who are "serious management concerns." Or. Admin. R. 291-055-0005(3)(a), 291-055-0010(6), 291-055-0019(1)(a). An inmate's transfer to IMU must be documented in an IMU Administrative Action Sheet. *Id.* 291-055-0019(3). The duration of IMU confinement depends in part on the inmate's behavior; an inmate's participation in self-improvement programs, mental health counseling, anger management, or other programming are factors in considering an inmate's removal or reassignment from IMU. *Id.* 291-055-0031(1).

On May 16, 2012, plaintiff was notified of his scheduled transfer to the IMU. Thornton Decl. Att. 5 at 22. On or about June 13, 2012, plaintiff requested administrative review of the IMU placement decision. *Id.* at 8-11.

7 - OPINION AND ORDER

On June 20, 2012, the classification manager, Joan Barton, reviewed plaintiff's request and found that plaintiff's assault of his cellmate and his disciplinary history supported placement in the IMU. Specifically, Barton informed plaintiff that "you unilaterally assaulted another inmate, who required outside medical intervention. Your behavior is a serious management concern and a threat to the safety, security and orderly operation of the institution." *Id.* Att. 5 at 6. Barton noted plaintiff's substantial disciplinary history: "You have been found in violation of 26 rules, 9 of which were assaultive in nature." *Id.* Barton concluded, "It appears that you could benefit from time in IMU to complete the programming that may provide you with additional tools that may help you avoid similar situations in the future." *Id.*

On September 12, 2012, plaintiff was transferred to the IMU until February 11, 2014, when he was transferred to the DSU for a rules violation. Thornton Decl. Att. 5 at 24-29, Att. 6 at 2. On April 12, 2014, plaintiff was transferred back to the IMU and remained there until June 18, 2014. In total, plaintiff was confined in the IMU for approximately 19 months.

The Supreme Court has held that the federal "Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Instead, a protected liberty interest may arise when segregated housing imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483-86 (1995); *see also Chappell v. Mandeville*, 706 F.3d 1052, 1064 (9th Cir. 2013). To determine whether a hardship is atypical and significant, the court considers: 1) "whether the conditions of confinement mirrored those conditions imposed upon inmates in analogous *discretionary* confinement settings"; 2) the "duration and intensity of the conditions of confinement"; and 3) whether the

8 - OPINION AND ORDER

change in confinement would "inevitably affect the duration of [the prisoner's] sentence." *Chappell*, 706 F.3d at 1064-65 (internal quotation marks and citation omitted).

If an inmate can establish a liberty interest in avoiding transfer to IMU, prison officials must conduct an informal, nonadversary review of the evidence justifying the decision. *See Wilkinson*, 545 U.S. at 228-29 ("where the State's interest implicates the safety of other inmates and prison personnel, the informal nonadversary procedures...provide the appropriate model"); *Toussaint v. McCarthy*, 801 F.2d 1080, 1100 (9th Cir. 1986), *abrogated in part on other grounds by Sandin*, 515 U.S. 472. "The prison officials must inform the prisoner of the charges against the prisoner or their reasons for considering segregation. Prison officials must allow the prisoner to present his views." *Toussaint*, 801 F.2d at 1100 (footnote omitted). A prisoner transferred to segregated housing is not entitled to "detailed written notice of charges, representation of counsel or counsel-substitute, an opportunity to present witnesses, or a written decision describing the reasons for placing the prisoner in administrative segregation." *Id.* at 1100-1101 (citations omitted); *but see Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996), *as amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998) (suggesting that a transfer to the IMU implicates a liberty interest requiring *Wolff* procedural protections). Finally, prison officials must periodically review the prisoner's placement in segregated housing. *See Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983), *abrogated in part on other grounds by Sandin*, 515 U.S. 472; *Toussaint*, 801 F.2d at 1101.

As defendants emphasize, plaintiff must do more than simply allege that his transfer to the IMU was unjustified; he must show that confinement in the IMU imposes an atypical and significant hardship. Defendants point out that plaintiff does not allege atypical and significant hardship and does not establish a protected liberty interest. *See* Am. Compl. at 31-33.

9 - OPINION AND ORDER

In response, plaintiff argues that the length and conditions of his IMU confinement posed an atypical and significant hardship entitling him to due process.[4] Pl.'s Reply at 13. During his 19 months in the IMU, plaintiff alleges that he was isolated and harassed and denied recreational time, social services, and access to the prison law library. Although transfer to the IMU itself has not been found to trigger a liberty interest, the Ninth Circuit has held that a pre-determined, twenty-seven month placement in the IMU imposes "an atypical and significant hardship under any plausible baseline" and creates a protected liberty interest requiring meaningful, periodic review. *See Brown v. Or. Dep't of Corr.*, 751 F.3d 983, 988 (9th Cir. 2014).[5]

Specifically, the Ninth Circuit found:

[Oregon] IMU inmates are held in solitary confinement for more than twenty-three hours per day. They are permitted outside of their cells for a total of only forty minutes per day and may spend thirty of those minutes engaged in recreation. Half of that time – fifteen minutes – may be spent in an "outside" facility reserved for IMU use, within a fifteen by forty-foot room with high, concrete walls covered by a metal grate....IMU inmates are permitted two non-contact visits per month and a maximum of two visitors in a six-month period...IMU inmates are denied access to many other privileges afforded inmates in the general population, including access to the prison and law libraries, group religious worship, educational and vocational opportunities, telephone use except in emergencies, access to televisions, and access to personal property.

---

[4] Defendants did not file a reply, and their original memorandum relied solely on plaintiff's failure to allege atypical hardship and did not argue what process would be due if the court found a protected liberty interest. Defs.' Mot. at 12-13 & nn. 6-7 (ECF No. 159). Accordingly, the court requested supplemental briefing to further clarify these issues. In its supplemental brief, defendants presented argument and also raised qualified immunity, an affirmative defense asserted in their Answer.

[5] As defendants note, neither the Supreme Court nor the Ninth Circuit has established clear baselines or parameters to determine when segregated housing constitutes "atypical and significant hardship," leaving prisoner litigants, prison officials, and district courts to grapple with this issue.

10 -   OPINION AND ORDER

751 F.3d at 985. "While these conditions alone might apply to most solitary-confinement facilities, here there is a crucial factor distinguishing confinement in the IMU: the duration of Brown's confinement." *Id.* at 988.

The court emphasized that "Brown's term of confinement in the IMU was dependent on his completion of fifty-three assigned [behavior modification] packets." *Id.* at 986, 987. "Because an inmate may complete only one program packet in any two-week period, Brown's confinement in the IMU could not possibly have lasted less than 106 weeks, regardless of the appropriateness of his continued segregation." *Id.* at 987. Consequently, "Brown was given a fixed and irreducible period of confinement in the IMU for twenty-seven months, in contrast to the limited period of confinement with periodic review afforded inmates in ODOC's other segregated housing units." *Id.* at 988. Under those circumstances, his "conditions of confinement in the IMU thus implicate a protected liberty interest under any plausible baseline." *Id.*

Defendants contend that plaintiff's 19-month confinement in the IMU arose from his own behavior and his "failure to comply with programming requirements." Defs.' Suppl. Brief at 5 (ECF No. 189). At the same time, the record does not establish whether plaintiff was given a "fixed and irreducible" period of confinement in the IMU based on the completion of required "packets" or other factors. Given the standard of review and the limited record before the court, I find it a question of fact whether plaintiff's had a "fixed and irreducible" confinement in the IMU that imposed an atypical or significant hardship.

Summary judgment is nonetheless appropriate if plaintiff received adequate due process. It is undisputed that plaintiff received notice of his IMU placement decision and an opportunity to respond through administrative review. *Toussaint*, 801 F.2d at 1100. Even if plaintiff was entitled to additional *Wolff* procedural protections, he received them during his disciplinary

11 -   OPINION AND ORDER

hearing, which formed the basis for his transfer to the IMU. *See Keenan*, 83 F.3d at 1089 (in determining whether a prisoner received adequate due process for an IMU transfer, "the district court may find relevant to its determination the fact that Keenan did attend and speak at the disciplinary hearing held just days earlier"). However, it remains unclear whether plaintiff's term of confinement allowed for "meaningful," periodic review. *Brown*, 751 F.3d at 987-988 (finding that "Brown's programming reviews were essentially meaningless" when prison officials lacked discretion to release him from IMU before completion of the assigned packets). Despite this unresolved issue of fact, I find that defendants are entitled to qualified immunity.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The court must determine whether a deprivation of a constitutional right occurred and whether the that right was clearly established at the time of the deprivation, though not necessarily in that order. *Id.* at 232-36; *Nelson v. City of Davis*, 685 F.3d 867, 875 (9th Cir. 2012).

Even assuming plaintiff had a protected liberty interest requiring due process protections and periodic review, that right was not clearly established at the time of plaintiff's confinement in the IMU. As the Ninth Circuit explained in *Brown*:

> Until now, this court has not addressed whether the absence of post-placement periodic, meaningful review of confinement in a disciplinary-segregation unit may give rise to a protected liberty interest....Although we conclude that a lengthy confinement without meaningful review may constitute atypical and significant hardship, our case law has not previously so held, and we cannot hold defendants liable for the violation of a right that was not clearly established at the time the violation occurred.

*Brown*, 751 F.3d at 989-90.

12 -    OPINION AND ORDER

Plaintiff was confined in the IMU from September 2012 to June 2014, and the Ninth Circuit did not issue *Brown* until April 29, 2014. If the defendants in *Brown* were entitled to qualified immunity for a prisoner's extended confinement in the IMU, the defendants in this case are entitled to qualified immunity as well.

Finally, to the extent plaintiff seeks declaratory or injunctive relief, ODOC has updated its IMU review process, and plaintiff is not likely to be subjected to the same conditions without review. *Id.* at 990; *see* Or. Admin. R. 291-055-0020(1)(c), 291-055-0031(2) (providing that an IMU placement review will be conducted "at least every 90 days" after the initial review "to determine further and appropriate program level assignment").

## CONCLUSION

Defendants' Motion for Summary Judgment (ECF No. 159) is GRANTED and plaintiff's Motion to Strike (ECF No. 170) is DENIED. This case is DISMISSED.

IT IS SO ORDERED.

DATED this 30th day of March, 2018.

_____
Ann Aiken
United States District Judge